928 F.2d 1132
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Danny R. COMPERRY and Velvet D. Comperry, Plaintiffs-Appellants,
v.
PHELPS DODGE INDUSTRIES, INC., Defendant-Appellee
v.
DEAL & MOOREFIELD, INC., Third Party Defendant.
 No. 90-5824.
 United States Court of Appeals, Sixth Circuit.
 March 21, 1991.
 
 On Appeal from the United States District Court for the Western District of Kentucky, No. 88-00164; Johnstone, C.J.
 W.D.Ky.
 AFFIRMED.
 Before KEITH and KRUPANSKY, Circuit Judges, and WELLFORD, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Danny R. Comperry ("Comperry") and his wife, Velvet D. Comperry,[1] (collectively "plaintiffs") appeal the district court's February 15, 1990, grant of summary judgment in favor of defendant Phelps Dodge Industries ("defendant") in this negligence action. For the reasons stated below, we AFFIRM.
 
 I.
 
 2
 Plaintiffs seek damages in this diversity action alleging defendant negligently failed to keep its premises in a reasonably safe condition. Defendant contends that it is immune from suit under the Kentucky Workers' Compensation Act, Ky.Rev.Stat.Ann. Ch. 342 (the "Act"). It filed a third-party complaint against Comperry's employer, Deal and Moorefield ("Deal"), for indemnity and contribution. Deal is not a party to this appeal.
 
 
 3
 Comperry was employed by Deal as a welder. Deal is in the business of general welding repair, steel fabrication, and retail sale of steel supplies. Defendant manufactures magnetic copper wire. Part of the manufacturing process involves heat treating the wire on an "annealing line."[2] The heat treating system consists of a base, a retort (also called a hood), and a bell furnace. Constant changes in temperature produce cracks in the retorts. If not welded, these cracks allow oxygen into the system. This causes the wire to oxidize and change color. Defendant employs two full-time welders to weld the retorts, floor, equipment, and overhead piping.
 
 
 4
 In February 1988, engineering and maintenance officials at the defendant's plant in Hopkinsville, Kentucky, decided to shut down the annealing line in order to repair a valve in the system. Since the annealing line was going to be inoperable all day to fix the valve, plant officials decided that it would also be a good time to repair cracks that had developed in several of the retorts.
 
 
 5
 Deal and defendant entered into a written agreement for the welding repair. Deal assumed the responsibility for all personal injuries arising out of its operation under the contract and agreed to indemnify, hold harmless, and defend defendant from any claim. The agreement required Deal to carry workers' compensation and liability insurance on its employees. This welding project was larger than the in-house welders usually performed in that several of the retorts were to be welded while the heat treating system was shut down and the retorts were on their bases.
 
 
 6
 Deal sent Comperry to the plant to perform the welding project on March 1, 1988. Comperry was injured in an explosion moments after he began welding. This negligence suit followed. Defendant filed a motion for summary judgment, arguing that the suit was precluded by workers' compensation since it was a "contractor" as defined and granted immunity in the Kentucky Workers' Compensation Act.
 
 
 7
 On February 15, 1990, the district court granted summary judgment dismissing the action finding no genuine issue of material fact and finding that defendant was a contractor. On February 22, 1990, plaintiffs moved for the district court to alter, amend, or vacate its decision granting summary judgment and simultaneously filed a motion requesting the court to certify questions of law to the Kentucky Supreme Court. On May 21, 1990, the district court entered an order denying both of plaintiffs' motions. Plaintiffs timely filed a notice of appeal on June 15, 1990.
 
 
 8
 Comperry has been receiving workers' compensation benefits from Deal's insurance carrier.
 
 II.
 A.
 
 9
 To prevail on a motion for summary judgment, the movant has the initial burden of proving the nonexistence of any genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has met its initial burden, the nonmovant must produce "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The nonmovant cannot rely on the pleadings themselves to establish the existence of a genuine issue of fact after the movant has surpassed its initial burden. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48.
 
 
 10
 Under Kentucky workers' compensation law, an employer's liability for an injury in the course of employment is limited to its obligations under the Act. Ky.Rev.Stat.Ann. Sec. 342.690. This section of the Act which provides for workers' compensation to be the exclusive remedy also provides that "[f]or purposes of this section, the term 'employer' shall include a 'contractor' covered by subsection (2) of KRS 342.610, whether or not the subcontractor has in fact, secured the payment of compensation." Ky.Rev.Stat.Ann. Sec. 342.690(1).
 
 
 11
 A "contractor" is defined in Ky.Rev.Stat.Ann. Sec. 342.610(2)(b) as one who contracts with another to have work performed which is a "regular or recurrent part of the work of the trade, business, occupation or profession of such person...."[3]
 
 
 12
 The gravamen of the dispute in this case is whether the welding repair on the retorts performed by Comperry was "regular or recurrent" so as to bring the defendant under the immunity protection of the Act. The precedent controlling this case is a Kentucky Supreme Court decision in Fireman's Fund Ins. Co. v. Sherman & Fletcher, 705 S.W.2d 459 (Ky.1986), and a decision by this court applying Sherman & Fletcher, Granus v. North Am. Philips Lighting Corp., 821 F.2d 1253 (6th Cir.1987).[4]
 
 
 13
 In Sherman & Fletcher, Sherman and Fletcher (the alleged contractor) was the owner and developer of a residential construction complex consisting of twenty-one townhouses. Elder, Inc., ("Elder") was a framing subcontractor hired by the general contractors to do the rough framing carpentry on the complex. David George ("George") was an employee of subcontractor Elder and was killed when a concrete wall at the construction site collapsed. Fireman's Fund had the workers' compensation coverage for subcontractor Elder and paid benefits to the estate of George.
 
 
 14
 The estate of George sued the alleged contractors, Sherman and Fletcher, seeking wrongful death recovery on the grounds that they had negligently supervised the construction of the concrete wall that collapsed and killed George. The alleged contractors were granted summary judgment on the ground that the Act precluded such recovery. The Supreme Court of Kentucky held that:
 
 
 15
 The statutes make it plain that if Sherman & Fletcher is a contractor, it has no liability in tort to an injured employee of a subcontractor. It is also clear that Sherman & Fletcher is a contractor if the work subcontracted to George's employer is work of a kind which is a regular or recurrent part of the work of the trade, business, occupation or profession of Sherman & Fletcher.
 
 
 16
 Elder, Inc., George's employer, contracted to perform the rough framing carpentry on the project. It cannot be disputed that rough framing carpentry is work of a kind which is the regular or recurrent part of the work of the occupation or trading of building construction in which Sherman & Fletcher was engaged.
 
 
 17
 Sherman & Fletcher, 705 F.2d at 461. The Sherman & Fletcher court explained that the purpose of including contractors under the liability of the Act, so that a contractor is liable for compensation benefits to an employee if a subcontractor does not secure benefits, was to prevent subcontracting to irresponsible people.
 
 
 18
 The Sherman & Fletcher court determined contractor status by comparing the nature of the task performed by the subcontractor and the business of the contractor without regard for whether this particular contractor regularly or recurrently performed the task that the subcontractor performed leading to injury. The court held that "[e]ven though he may never perform that particular job with his own employees, he is still a contractor if the job is one that is usually a regular or recurrent part of his trade or occupation." The court found that Sherman & Fletcher was in the business of building construction and that rough framing carpentry is work of a kind regular or recurrent to the building construction business.
 
 
 19
 In Granus v. North Am. Philips Lighting Corp., 821 F.2d 1253 (6th Cir.1987), this Court applied Sherman & Fletcher to affirm a directed verdict in favor of a defendant owner of a glass factory, North American Philips Lighting Corporation ("Philips"). We held Philips to be a contractor under the Act under the following circumstances. The injured plaintiff, Granus, was a brick mason injured while working at defendant's glass factory. Granus' task was preparing bricks for the relining of a furnace. Granus was employed by Corning Glassworks, which was under a contractual obligation to refurbish a glass-melting tank in the factory. The refurbishing necessitated relining the tank's furnace with refractory brick. This contractual obligation was part of a contract of sale in which Corning, the subcontractor and previous owner of the factory, had sold the factory to defendant Philips.
 
 Analyzing the facts in Granus, we found:
 
 20
 It is undisputed that Philips contracted with Corning to rebrick the tank furnace, and it is undisputed that firebricks must be replaced periodically as an ordinary part of plant maintenance. When Philips contracted with Corning for the renovation of the furnace, therefore, it was contracting to "have work performed of a kind of which is a regular or recurrent part" of Philips's business. K.R.S. 342.610(2). Philips was thus a "contractor" under the statute, and Mr. and Mrs. Granus's tort action was barred.... The relining of furnaces, required periodically as a matter of regular maintenance, is likewise a "recurrent" part of the manufacturing business in which defendant Philips is engaged.
 
 
 21
 Granus, 821 F.2d at 1257-58.
 
 
 22
 Applying the analysis used by the Kentucky Supreme Court in Sherman & Fletcher and this Court in Granus, the pivotal question in this case is whether welding retorts is a regular or recurrent part of the trade of annealing wire. Under Granus, tasks that are required periodically as a matter of regular maintenance are "regular or recurrent." We find that the district court properly held that there was no genuine issue of material fact as to whether retort welding was a "regular or recurrent" part of defendant's business.
 
 
 23
 Plaintiffs try to avoid the recurrent nature of welding the retorts by proffering a narrow definition of the task. Plaintiffs wish to define the task as in-place refurbishment of all of the retorts at one time. Appellants' Brief at 23. We decline to so narrow the description. First, we note that if enough details were added to any description of a task, the task would become unique. For example, the plaintiffs could have added even more detail to their description of the task and defined it as "in-place refurbishment of all of the retorts at one time, performed by an outside contractor, Deal, when the number of cracks was greater than five but less than fifty." The more factors that would have to be replicated, the more unlikely a future occurrence would match all of the elements of the description. The result of defining tasks with unlimited detail would be the elimination of tasks that could be defined as recurrent. Our analysis of prior cases convinces us that only the details relevant to describe the task as it serves the production process are to be considered.
 
 
 24
 In determining which details we will include to define the task alleged to be recurrent, we look at which details are relevant to the goal of the production process. In the previous cases where a task was analyzed to determine its recurrence, the task was defined broadly. In Sherman & Fletcher, the task was defined as frame construction. In Granus, the task was defined as furnace relining, even though the actual activity engaged in by the injured party was sawing bricks for use in the furnace relining. Sawing bricks is not itself essential to the glass production process. The task needed to maintain the production of glass was the relining of the furnace. Brick production was merely an element of that task.
 
 
 25
 Here, whether the torts are welded one at a time while the line is running or whether they are welded all at once while the line is shut down makes no difference to the fulfillment of the line's maintenance. The annealing process can be performed equally well, regardless of the circumstances used to perform the maintenance. Thus the different circumstances are equivalent and if either of them must be performed recurrently, the task is one which is performed recurrently.
 
 
 26
 Despite plaintiffs' argument to the contrary, they failed to provide evidence establishing a genuine issue of material fact as to whether the welding was "recurrent." Without such evidence, the district court's grant of summary judgment was appropriate. The record was filled with evidence that welding was recurrent. Not only must retorts generally be welded as a matter of maintenance of an annealing line, but that these particular retorts had been repeatedly rewelded. Several witnesses testified that the welding was recurrent. Plant Engineer Frank Hayes ("Hayes") testified that repair of the retorts was a "common thing; did it all the time." Joint Appendix at 198 (Deposition of Frank Hayes). Lee Russell, general foreman of the mill, testified that "every one of [the retorts] probably gets welded sometime during the course of a year. So you could say once a month average and sometimes maybe twice." Joint Appendix at 329 (Deposition of Leo Russell). Tony Cook, one of the two full-time welders employed by Phelps Dodge at the plant, testified concerning welding retorts that "[s]ometimes we'd have to do it once a week, sometimes twice a week and sometimes it'd take all week depending on how many of them's cracked down at the time." Joint Appendix at 334-35 (Deposition of Tony Cook).
 
 
 27
 While plaintiffs argue that all of these statements were false and unreliable, they did not place contrary evidence in the record sufficient to create a genuine issue of material fact. Plaintiffs respond that the paper work generated for repairs, both by internal employees of Phelps Dodge and by outside contractors, fails to demonstrate frequent repairs. But it is uncontradicted in the record that paperwork was not done for every repair and thus an absence of paperwork is not an indication that other welding did not go on. Harold Reynolds, plant engineering supervisor, testified that he is quite sure that not all instances of welding repair work show up in the paperwork. Joint Appendix at 539-40 (Deposition of Harold Reynolds). No one testified that the routine of paperwork so closely recorded actual repairs that an absence of paperwork indicated that other welding was in fact not done.
 
 
 28
 Plaintiffs also point to the results of an inspection by Hayes in which Hayes counted sixty-two prior welds on ten retorts of the twelve. (The other two were not available for inspection at the time). Plaintiffs argue that this number of welds is not in conformity with the frequency of welds claimed by defendant's witnesses and therefore makes defendant's claims incredible. Even an average of six welds per retort would indicate that the process was recurrent. It is uncontradicted, that it was possible that other welds were present, but were simply not discernable by Hayes' inspection. Furthermore, it is uncontradicted that it was possible that the same crack had been repeatedly welded. Joint Appendix at 102 (Affidavit of Frank Hayes).
 
 
 29
 Plaintiffs misleadingly point out that the plant maintenance superintendent, Tom Zaleski ("Zaleski"), stated that he was unaware of a single instance of welding on a retort during his entire tenure with the company. Reply Brief at 3. In fact, Zaleski stated that he couldn't say that no one ever welded on a retort, but just that he couldn't remember. Joint Appendix at 466 (Deposition of Tom Zaleski). Quite to the contrary of plaintiffs' implication, Zaleski indicated that plant personnel would not have contacted him concerning such matters. Id. at 467-68, 475. Also contrary to the implication, Zaleski testified that although he had not seen the welding occurring, he was certain that it had been taking place. Id. at 477.
 
 
 30
 Plaintiffs thus failed to create a genuine issue as to the recurrent nature of the welding. Under Granus and Sherman & Fletcher, therefore, defendant was a contractor, and under the Act, a contractor is an employer.
 
 B.
 
 31
 Not all employers have immunity. The Act limits the immunity from suit to employers who have secured payment of compensation as they are required by the Act. The statute reads that "[i]f an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive...." Ky.Rev.Stat.Ann. Sec. 342.690(1).
 
 
 32
 Plaintiffs argue that even if defendant is a contractor and therefore an employer under the Act, that defendant has failed to "secure[ ] payment" because it lacked liability to pay workers' compensation benefits. The Act provides that a contractor is liable for the payment of compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment has secured payment. Even then, the contractor is entitled to recover that compensation from the subcontractor. Ky.Rev.Stat.Ann. Sec. 342.610(2).
 
 
 33
 Plaintiffs argue that since defendant's subcontractor was carrying workers' compensation insurance, thus having "secured payment," defendant was not liable. From this purported lack of liability, they conclude that defendant has not "secured payment" as required for protection of the exclusivity of the workers' compensation remedy. This Court in Granus, however, held that the potential liability of a contractor resulting from the possibility that the subcontractor would not properly secure benefits was sufficient liability to meet the "secures payment" requirement. Having determined that Philips was a contractor, we went on to say that:
 
 
 34
 Philips, as contractor, would therefore be liable for workers' compensation benefits to Mr. Granus if Corning [the subcontractor] had not secured those benefits. "That potential liability for workers' compensation benefits relieves [the defendant] from tort liability. KRS 342.690." Fireman's Fund, 705 S.W.2d at 462.
 
 
 35
 Granus, 861 F.2d at 1258. Defendant in the instant case, through its potential liability, has secured payment to the extent it is required to do so and is therefore an employer entitled to the immunity of the Act.
 
 C.
 
 36
 Plaintiffs next argue that, as applied to this case, the Act violates Kentucky constitutional protections for common law rights to sue. Plaintiff invokes sections 14 and 54 of the Kentucky constitution. Section 14 states:
 
 
 37
 All courts shall be open, and every person, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay.
 
 Section 54 states:
 
 38
 The general assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property.
 
 
 39
 The constitutionality of the Act has been upheld because any employee who desires to preserve his right to sue for injuries suffered on the job can reject the coverage of the Act by affirmatively electing not to be covered. Ky.Rev.Stat.Ann. Sec. 342.395; Wells v. Jefferson County, 593 S.W.2d 462 (Ky.1953). The Kentucky courts have upheld the statute not only as to employers, but also as to contractors. Simmons v. Clark Constr. Co., 426 S.W.2d 930 (Ky.1968). In Simmons the Kentucky Court of Appeals, then the highest court, stated:
 
 
 40
 The constitutionality of the Act as to claims between employer and employee is well established. We are unwilling to depart from our decision in McEvilly v. L.E. Meyers Co., 211 Ky. 31, 276 S.W. 1068 (1925) that an employee of a subcontractor could not successfully sue the principal contractor for common law damages.
 
 
 41
 Id. at 933 (citations omitted).
 
 
 42
 Plaintiffs wish to distinguish Simmons on the grounds that defendant in the instant case was not the owner of the premises and therefore did not owe a common law duty of care. Appellants' Brief at 41. We find plaintiffs' argument unpersuasive. It is clear that the decision in Simmons did not rest on ownership of the premises. As noted in the quote set forth above, the court relied on McEvilly. In McEvilly, after finding that there was no duty, the court continued with an alternative ruling that even if there had been a legal duty, the contractor was not subject to liability because of the Act. Rather than being an obstacle to coverage, the McEvilly court held that the fact that the injury occurred on the contractor's premises supported a finding that the contractor was clearly covered under the Act. McEvilly, 211 Ky. 31, ----, 276 S.W. 1068, 1071 (Ky.1925). Therefore, despite the Simmons case, Kentucky courts have already determined that the Act is constitutional even as applied to a contractor when the injury occurs on the contractor's premises and even where there is a duty of care.
 
 D.
 
 43
 Plaintiffs argue that Comperry did not properly waive his right to sue under common law and, therefore, did not properly accept the compensation scheme provided in the Act in lieu of the scheme provided by common law. They argue that when he began his employment he could not have anticipated the ruling in Sherman & Fletcher, and therefore his waiver was not based on sufficient knowledge. We reject plaintiffs' argument. Plaintiffs acknowledge that the statute presumes acceptance and that waiver requires an affirmative act on the part of the employee. Plaintiffs' Brief at 44. The relevant part of the statute states:
 
 
 44
 [E]very employe of such employer, as a part of his contract of hiring ... shall be deemed to have accepted all the provisions of this chapter and shall be bound thereby unless he shall have filed, prior to the injury ..., written notice to the contrary with the employer....
 
 
 45
 Ky.Rev.Stat.Ann. Sec. 342.395 (emphasis added).
 
 
 46
 We conclude that plaintiff was able to knowingly waive coverage of the Act from the time the Sherman & Fletcher decision was published until the day of his accident almost two years later. Any lack of knowledge at the time of hiring was thus irrelevant.
 
 III.
 
 47
 For the foregoing reasons, we AFFIRM the decision of the Honorable Edward H. Johnstone, Chief Judge of the United States District Court for the Western District of Kentucky.
 
 
 
 [1]
 Velvet Comperry's claims are all derivative of the negligent injury claims of her husband, plaintiff Danny Comperry
 
 
 [2]
 Annealing is the process of heat treating the wire to soften it and make it more flexible
 
 
 [3]
 The subsection in its entirety reads as follows:
 (2) A contractor who subcontracts all or any part of a contract and his carrier shall be liable for the payment of compensation to the employes of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured payment of compensation as provided for in this chapter. Any contractor or his carrier who shall become liable for such compensation may recover the amount of compensation paid and necessary expenses from the subcontractor primarily liable therefor. A person who contracts with another (a) to have work performed consisting of the removal, excavation or drilling of soil, rock or mineral, or the cutting or removal of timber from land, or (b) to have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation or profession of such person, shall for the purposes of this section be deemed a contractor, and such other person a subcontractor. This subsection shall not apply to the owner or lessee of land principally used for agriculture.
 Ky.Rev.Stat.Ann. Sec. 342.610(2).
 
 
 [4]
 Since we find this case controlled by precedent, we find it unnecessary to certify any questions of law to the Supreme Court of Kentucky, as requested by plaintiffs